## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

JOHN EDGAR WILLIAMS, III,    )
                                  )
        **Plaintiff,**        )
                                  )   **Case No.  15-CV-0028-JED-FHM**
**v.**                              )
                                  )
**DENNIS MILLER, Corporal,**    )
                                  )
        **Defendant.**      )

## OPINION AND ORDER

This is a 42 U.S.C. § 1983 civil rights action commenced by Plaintiff John Edgar Williams, III, a prisoner appearing *pro se* and *in forma pauperis*.  Defendant filed a motion for summary judgment (Doc. 23) and a Special Report  (Doc. 13), as directed by the Court.  Plaintiff filed a response to Defendant's motion for summary judgment (Doc. 25) and an affidavit (Doc. 26).  Defendant did not file a reply to Plaintiff's response.  For the reasons discussed below, the Court grants Defendant's motion for summary judgment in part and denies the motion in part.

### *BACKGROUND*

In his complaint (Doc. 1), Plaintiff contends that, while he was a pretrial detainee at the David L. Moss Criminal Justice Center ("DLM"), Defendant Dennis Miller used excessive force against him and denied him adequate medical care.  The record reflects that, on May 17, 2014, a staff member at DLM allowed Plaintiff to leave his maximum security pod without an escort (*id.* at 6; Doc. 26 at 1-2).  Plaintiff began walking down the hall towards the medical unit to receive a breathing treatment for an asthma attack (Doc. 1 at 6; Doc. 25 at 2).  Defendant Miller, a corporal with the Tulsa County Sheriff's Office ("TCSO") who had been transferred to DLM the previous

week, spotted Plaintiff and ordered him to return to his pod because, as a "close custody" inmate,[1]

he was not allowed to move around the facility without an escort (Doc. 13 at 4; Doc. 23 at 6; *see*

Doc. 26 at 2). Plaintiff told Defendant that he was going to the medical unit (Doc. 26 at 2), but

Defendant, along with Deputy Jeremiah Alexander and Detention Officer David Burns (DO Burns),

began walking toward Plaintiff to ensure he returned to his pod (Doc. 23 at 2).[2] Plaintiff then turned

and walked back to his pod with Defendant and the two officers following him (*id.* at 4; Doc. 26 at

2). Plaintiff does not controvert Defendant's assertion that Plaintiff's compliance with Defendant's

initial order to return to his pod was done begrudgingly and only after Defendant, flanked by the

other two officers, began walking down the hall toward him (Doc. 23 at 4; Doc. 26 at 2). Defendant

does not allege that Plaintiff acted aggressively in the hallway, but he does allege that Plaintiff used

profanity (Doc. 23 at 4).

Plaintiff asserts that, after he returned to his pod and entered the first door of the sally port

leading into the pod, he threw his empty asthma inhaler onto the floor of the hallway before the door

closed (Doc. 26 at 2).[3] Plaintiff states that Defendant Miller, still accompanied by Deputy Alexander

and DO Burns, "turned back towards the exterior slider before it closed" (*id.*). Defendant ordered

Plaintiff to pick up the empty inhaler, and Plaintiff refused (*id.* at 2-3). Plaintiff alleges that

---

[1] According to Defendant, "[c]lose custody means that the inmate has pending charges for a violent crime . . . or that the inmate has an extremely high bond amount" (Doc. 23 at 1). At this point in time, Plaintiff had been housed at DLM for two years while he awaited trial in Tulsa County District Court (Doc. 26 at 2).

[2] In Defendant's affidavit (Doc. 23-2), both Alexander and Burns are identified as deputies. In Defendant's motion for summary judgment (Doc. 23), Alexander is identified as a deputy and Burns is identified as a detention officer. The Court will refer to Alexander and Burns as they are identified in the motion for summary judgment.

[3] Although Defendant, Deputy Alexander, and DO Burns were standing in the hallway at that time, Defendant does not assert that Plaintiff threw the inhaler at him or the other officers.

2

Defendant then "drew his Taser and took aim at [his] body" (Doc. 25 at 2).  Plaintiff states that he "showed [Defendant] the palms of [his] hand[s] in surrender (above my waist but not above my head), and I inquired, 'Damn, are you going to tase me for not picking [the inhaler] up?'  Tasing me was [Defendant's] only response" (*id.*).

Plaintiff states that he was then handcuffed, and Defendant "ordered that I still had to pick up the inhaler" (*id.*).  Plaintiff states that he then "informed [Defendant] that [his] back was hurt, [and his] knee did not bend much because [he had] permanent [knee] damage" (*id.* at 2-3).  Plaintiff does not dispute that one of the other two officers – DO Burns – took hold of Plaintiff and forced him down to pick up the empty inhaler (*id.* at 3; *see* Doc. 23 at 2).  Still, Plaintiff contends that "[i]t was already clear that [Defendant] was the leading officer of the three.  He was the only one calling shots or giving orders" (Doc. 25 at 3), and that "I do know that it was [Defendant's] command" that he "still had to pick up the inhaler" (*id.* at 2; Doc. 26 at 3).  After Plaintiff picked up the inhaler, Defendant "instructed one of the other officers to take [Plaintiff] to the booking nurse" (Doc. 1 at 7).  Plaintiff acknowledges that he was using profanity during his encounter with Defendant, but he states that he "never made any aggressive threats or movements" (*id.* at 6), "wasn't hostile and belligerent" (Doc. 25 at 2), and "was not a threat to anyone" (*id.*).  Plaintiff also asserts that, as a result of being Tasered, "[w]hen [his] body locked up and [he] fell to the floor, [his] back was hurt" (Doc. 1 at 3).  Plaintiff claims that the medical staff stated they would schedule an appointment to examine his back, but "[t]hey never have" (*id.* at 7).

In contrast to Plaintiff's version of events, Defendant claims that after twice ordering Plaintiff to pick up the inhaler, Plaintiff "took an aggressive stance, clenched his fists and stated 'What the fuck are you going to do, tase me?'  [Defendant] drew his Taser and deployed it towards

Plaintiff" (Doc. 23 at 2).   Defendant asserts that he deployed his Taser because, "[b]ased on [Plaintiff's] behavior, [he] believed [Plaintiff] might escalate his aggression" (Doc. 23-2 at 2). Defendant states that he wanted to "avoid any hands on confrontation with [Plaintiff]" and did not want to "use pepper spray due to the location and the number of persons present, and the risk of cross contamination" (*id.*).

Plaintiff filed this civil rights action on January 16, 2015 (Doc. 1).   Based on the events described above, Plaintiff identifies three (3) counts[4]:

| Count 1: | Cpl. Miller used excessive force against me. |
| Count 2: | When my body locked up and I fell to the floor, my back was hurt. |
| Count 3: | As I were [sic] being tazed, I urinated on myself.  I was humiliated for seeking medical care. |

(*id.* at 2-3).  The Court previously dismissed Count 3 for failure to state a claim (Doc. 20).  In his request for relief, Plaintiff seeks $10,000 from Defendant Miller as well as "a refund of everything that has been charged from inmate account" (Doc. 1 at 5).

On January 26, 2016, Defendant Miller filed a Rule 56 motion for summary judgment (Doc. 23).  Defendant argues that (1) his use of force was constitutionally permissible, (2) he did not act with deliberate indifference to Plaintiff's medical needs, and (3) he is entitled to qualified immunity (*id.*).  Plaintiff filed a response to the motion for summary judgment (Doc. 25) and an affidavit (Doc. 26).  Defendant did not file a reply.

---

[4] Plaintiff provides additional factual allegations in support of his claims (*see* Doc. 1 at 6-7). In describing Plaintiff's claims, the Court includes only Plaintiff's first sentences for the three counts.

*ANALYSIS*

## I.     Summary Judgment Standard

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Kendall v. Watkins*, 998 F.2d 848, 850 (10th Cir. 1993).  "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) (citation and internal quotation marks omitted).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Durham v. Xerox Corp.*, 18 F.3d 836, 838-39 (10th Cir. 1994) (citation and internal quotation marks omitted).

## II.     Qualified Immunity

In his motion for summary judgment, Defendant alleges that he is entitled to qualified immunity (*see* Doc. 23 at 13-16).  In resolving questions of § 1983 qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry. *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014).  The first prong "asks whether the facts, taken in the light most favorable to the party

asserting the injury, . . . show the officer's conduct violated a federal right." *Id.* (citation, alterations, and internal quotation marks omitted); *see York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008). The second prong asks "whether the [federal] right in question was 'clearly established' at the time of the violation." *Tolan*, 134 S. Ct. at 1866 (citation omitted). Once Defendant asserts qualified immunity, Plaintiff has the burden of demonstrating both that Defendant violated Plaintiff's constitutional right and that the constitutional rights were "clearly established" at the time Defendant acted. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011). The court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

"[F]or a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013) (internal quotation marks and citation omitted). The Tenth Circuit has adopted a "sliding scale to determine when law is clearly established." *Pauly v. White*, 814 F.3d 1060, 1075 (10th Cir. 2016). Under this sliding scale, "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (internal quotation marks and citation omitted).

To show that the constitutional right was "clearly established" at the time Defendant acted, the Court does "not require a case directly on point." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). Even though there need not be a "case directly on point," courts are "not to define clearly established

6

law at a high level of generality" and "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Id.* at 741, 742 (citations omitted) (emphasis added). The right must be "sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and alterations omitted) (emphasis added). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citation omitted).

## III.    Plaintiff's Allegations of Excessive Use of Force

In Counts 1 and 2 of his complaint (Doc. 1), Plaintiff alleges that, on May 17, 2014, Defendant Miller used excessive force against him. Specifically, Plaintiff claims that Defendant "tazed me for refusing to pick up an empty inhaler that I dropped on the floor" (*id.* at 2) and forced him to pick up the inhaler after he told Defendant that his back and his knee were injured (*id.* at 7). Because the incident giving rise to Plaintiff's excessive use of force claims occurred while he was a pretrial detainee, his claim is governed by the due process clause of the Fourteenth Amendment. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015); *see also Estate of Booker v. Gomez*, 745 F.3d 405, 420-21 (10th Cir. 2014).

For the reasons discussed below, the Court finds that, as to Plaintiff's claim involving Defendant's use of a Taser, a reasonable jury could find that Defendant violated Plaintiff's constitutional rights and that Defendant is not entitled to qualified immunity. Therefore, the Court denies Defendant's motion for summary judgment as to Plaintiff's claim that Defendant's use of a Taser constituted an excessive use of force. As to Plaintiff's claim that Defendant used excessive

force in forcing him to pick up the empty inhaler, the Court finds there is no genuine dispute of material fact, and Defendant is entitled to judgment as a matter of law on this claim.

### A.     Taser Deployment

#### 1.     Constitutional Violation

Viewing the facts of the case in the light most favorable to Plaintiff, *see Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995), the Court first determines whether Defendant's use of a Taser to compel compliance from Plaintiff – a pretrial detainee who was neither acting aggressively nor actively resisting efforts to restrain him – violated the Constitution.

The Supreme Court has held that "[i]n deciding whether the force deliberately used" against a pretrial detainee "is, constitutionally speaking, 'excessive,' . . . courts must use an objective standard." *Kingsley*, 135 S. Ct. at 2472-73.  To meet that standard, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473.  Citing *Graham v. Connor*, 490 U.S. 386, 396 (1989), the Court explained that:

> [c]onsiderations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 135 S. Ct. at 2473 (citation omitted).  The Court further explained that "[a] court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (citation omitted).  In addition,

> [a] court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail

8

officials "are needed to preserve internal order and discipline and to maintain institutional security."

*Id.* (citation omitted).

Applying the factors emphasized by the Supreme Court and considering the totality of the circumstances, the Court concludes that a reasonable jury could find that Defendant violated Plaintiff's constitutional rights. The evidence, viewed in the light most favorable to Plaintiff, shows that, although Plaintiff did not comply immediately with Defendant's verbal command to return to his pod, Plaintiff did walk back to his pod and enter the sally port once Defendant moved toward him. Defendant does not allege that Plaintiff became aggressive before entering the sally port or that he needed to employ any additional force to get Plaintiff to return to his pod. Even though Plaintiff threw his empty inhaler into the hallway, Defendant does not assert that Plaintiff threw the empty inhaler at him or Deputy Alexander and DO Burns, who were both with Defendant at the time. When Defendant pulled his Taser, Plaintiff "showed [Defendant] the palms of [his] hand[s] in surrender" and said "[d]amn, are you going to tase me for not picking [the inhaler] up?" (Doc. 25 at 2 (internal quotation marks omitted)). Defendant did not verbally respond but immediately deployed his Taser. At no time before Defendant deployed his Taser did he attempt to restrain Plaintiff. Plaintiff asserts that throughout the encounter he did not act aggressively or make any verbal threats towards Defendant or the other officers.

On summary judgment, Defendant presents no evidence to corroborate his version of the events. Defendant states that Deputy Alexander and DO Burns were present throughout the incident, but Defendant did not provide affidavits from either of the two officers who were present and witnessed the relevant events. Additionally, TCSO states in its Special Report that Defendant filled out a "use of force form," was "referred [] to internal affairs for an administrative

investigation," and "a pre-action hearing was held," but TCSO failed to provide the Court with any evidence related to these proceedings (Doc. 13 at 3-4).  Also, in response to the motion for summary judgment, Plaintiff controverts many of Defendant's alleged material facts.  However, Defendant did not file a reply.[5]

> In the Special Report, TCSO reports that:
>
> [s]urveillance video captured the sequence of events in the main hallway and there is a view from inside the pod, but not within the sallyport (entryway) where [Plaintiff] was tased.  This is because the video system automatically "dumps" the video from inside the sallyport within three days if the video is not saved, and this video was not retrieved within three days of May 17, 2014.

(*Id.* at 1).  Defendant does not provide either the surveillance video showing the events in the main hallway or the video from inside the pod.  TCSO's "Standard Operating Procedure #7," 7.3 F.1, instructs that, after a Taser deployment, "[e]ach employee involved . . . ***must*** complete a Use of Force Form . . . . The report will be submitted before the end of shift" (Doc. 23-3 at 3 (emphasis added)).  According to the Special Report, "[Defendant] completed the requisite use [of] force forms as dictated by the policy of the [TCSO]" (Doc. 13 at 3).  Neither TCSO nor Defendant explain why the sally port video was not preserved after Defendant completed the "use of force form."  Additionally, the Court notes that, in the Special Report, TCSO states that it reviewed "the surveillance video at DLM documenting the event in question" to determine an appropriate course

---

[5] It is curious, in light of Plaintiff's disputation of several of Defendant's alleged uncontroverted facts, that Defendant did not file a reply.  Further, it would have been easy enough to provide affidavits from Deputy Alexander and/or DO Burns unless, of course, their eye-witness testimony did not square with Defendant's story.  The Court also notes that, under TCSO's policies (Standard Operating Procedure # 7 Use of TASERs, 7.3(F.1) (Doc. 23-3 at 6)), Deputy Alexander and DO Burns would have been required to fill out a "Use of Force Form," although this was not addressed in either the Special Report or the motion for summary judgment.

of action (*id.*).  This statement appears to conflict with TCSO's assertion that the video from the sally port was not preserved.

The *Graham* factors, as reemphasized in *Kingsley*, weigh heavily in favor of Plaintiff.  The summary judgment record, viewed in the light most favorable to Plaintiff, shows that the relationship between the force needed and the amount used is tenuous.  Although maintaining discipline is a legitimate penological interest, any danger associated with Plaintiff's failure to pick up his empty inhaler was minimal.  From the time Plaintiff threw the inhaler into the hall until Defendant deployed his Taser, Plaintiff was in a semi-confined space – the sally port leading into his pod with its exterior door open and its interior door closed.  Had Defendant allowed the exterior sally port door to close, Plaintiff would have been completely confined within a matter of moments, removing any dangers associated with "[Defendant] or any of the other Deputies [] stoop[ing] down [to pick up the inhaler] in close proximity to [Plaintiff]" (Doc. 23-2 at 2).  As Plaintiff points out in his response, Defendant had other options for maintaining discipline and "had all rights to write a misconduct or disciplinary report, that would have led me to losing my privileges for as long as he'd request" (Doc. 25 at 1).

Weighing in Defendant's favor is the possibility that, because Plaintiff was a close-custody inmate, Defendant may have perceived Plaintiff to be a threat.  Even so, the lack of any physical aggression by Plaintiff coupled with Plaintiff's show of surrender by presenting his hands, does not suggest a serious threat.  Additionally, during the incident, two other officers accompanied Defendant as he confronted Plaintiff, who was coughing, wheezing, and in respiratory distress.  Defendant also attempts to justify his actions by stating he "believed [Plaintiff] *might* escalate his aggression" and he "did not want the incident to escalate into a physical confrontation" (Doc. 23-2

at 2 (emphasis added)), but the mere possibility of a physical confrontation did not warrant Defendant deploying his Taser.  In light of the factors discussed above, and viewing the facts in the light most favorable to Plaintiff, any serious threat perceived by Defendant was not reasonable and did not justify deployment of his Taser.[6]

The minimal security problem at issue and the lack of active resistance by Plaintiff also weigh in Plaintiff's favor.  Plaintiff showed his hands in surrender before he was Tasered.  This demonstrated that Plaintiff was not actively resisting the officers and eliminated the need to use a Taser to subdue Plaintiff.  The empty inhaler itself did not present any sort of security threat to Defendant or the other officers involved, and Defendant had other options for addressing Plaintiff's recalcitrance and enforcing discipline.

The Court also considers the extent of Plaintiff's injuries.  Plaintiff asserts that, when Defendant stunned him with the Taser, "[m]y body locked up, I fell over and urinated myself as I flopped and jerked around.  As I was being placed in cuffs I then knew my back was hurt" (Doc. 25 at 2).  Beyond any injury to Plaintiff's back, the pain resulting from the Taser itself was significant. The Eighth Circuit has noted that:

> a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless.  This is exactly the sort of torment without marks with which the Supreme Court was concerned in *[Hudson v.] McMillian*[, 503 U.S. 1 (1992)], and which, if inflicted without legitimate reason, supports the Eighth Amendment's objective component.

---

[6] Although Defendant asserts that Plaintiff "took an aggressive stance" and "clenched his fists" after entering the sally port (Doc. 23 at 2), on summary judgment the Court views the facts in the light most favorable to Plaintiff, who asserts that he "never made any aggressive threats or movements" (Doc. 1 at 6).

*Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993) (footnote and citations omitted); *see Orem v. Rephann*, 523 F.3d 442, 447-48 (4th Cir. 2008), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).

Additionally, it appears that Defendant failed to temper or limit the amount of force he used against Plaintiff.  Plaintiff states that, during the incident, "[n]ot once did [Defendant] or the officers insinuate that I was going to be or needed to be restrained.  They never told me to put my 'hands up' or turn around and 'put your hands behind your back' or 'get on the ground'" (Doc. 25 at 4). Defendant presents no evidence to contradict Plaintiff's assertion.  Defendant claims that he did not want to engage in a "hands on confrontation" with Plaintiff, but Defendant never even issued a verbal command in an attempt to restrain Plaintiff, even though Plaintiff "showed [Defendant] the palms of [his] hand[s] in surrender" after Defendant pulled his Taser (*id.* at 2).

The Court evaluates whether a defendant's actions were objectively unreasonable "from the perspective of a reasonable officer on the scene."  *Kingsley*, 135 S. Ct. at 2473 (citation omitted). As has been noted, during the incident, Defendant was accompanied by two other – presumably reasonable – officers.  *See Orem*, 523 F.3d at 448 ("In this case, we need not use hindsight or conjure up a pseudo-'reasonable officer' because, two other presumably 'reasonable officers' were at the scene.").  Although Deputy Alexander and DO Burns witnessed Plaintiff's behavior, Defendant does not allege in his motion for summary judgment or affidavit that either of the officers pulled a Taser or otherwise attempted to restrain Plaintiff.

The Court should "appropriately defer[] to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley,* 135 S. Ct. at 2473 (citation and internal quotation marks omitted).  However,

it does not appear that Defendant's actions complied with DLM policies and practices.  Under

TCSO's "Standard Operating Procedure # 7 Use of TASERs":

> **C.**     **Authorization to Use TASER.**  Employees are authorized to use the TASER
> under the following conditions:
>
>> **C.1**     To control a dangerous or violent subject when deadly force does not
>> appear to be justified and/or necessary;
>>
>> **C.2**     If attempts to subdue the subject by other conventional tactics have
>> been, or will likely be, ineffective in the situation at hand; or
>>
>> **C.3**     If there is reasonable expectation that it will be unsafe for officers to
>> approach within contact range of the subject . . .
>
> **D.**     **Prohibitions:**
>
>> **D.1**     The TASER may not be used on individuals who can be controlled
>> by voice command or direction.
>>
>> **D.2**     The TASER may not be used as punishment or retaliation.
>>
>> **D.3**     TASERs will not be used in conjunction with O.C. Spray.
>>
>> **D.4**     Tasers should not be used on handcuffed inmates without extenuating
>> circumstances.

(Doc. 23-3 at 2).  According to the Special Report, Defendant completed a "Use of Force Form" and,

> [u]pon review of this use of force, the individuals composing the Use of Force
> Review Board referred [Defendant] to internal affairs for an administrative
> investigation.  An investigation was conducted, and a pre-action hearing was held to
> determine what, if any, action to take with regard to [Defendant's] use of force.
> [Defendant] . . . was ordered to attend the jail academy where new detention officers
> are trained, and also ordered to have a one-on-one review of the Use of Force policy
> with Sgt. Mark Stevens, the TCSO training director.

(Doc. 13 at 3-4).

Viewing the facts in the light most favorable to Plaintiff, TCSO's policies and procedures

do not authorize Defendant's conduct.  Plaintiff was not behaving dangerously or violently during

the incident, and Plaintiff was showing his hands in surrender when Defendant stunned him with a Taser. As discussed above, any expectation that it would be unsafe for officers to approach Plaintiff was not reasonable. Additionally, a jury could conclude that, in light of the circumstances and Plaintiff's assertion that Defendant's "emotion[] was of anger" (Doc. 25 at 1), Defendant deployed his Taser as punishment or retaliation, which is prohibited under TCSO's policies.

In summary, Plaintiff controverts many of Defendant's material facts and asserts that Defendant stunned him with a Taser although he was not acting aggressively or posing a threat. Viewing the facts in the light most favorable to Plaintiff, the Court concludes that the *Graham* factors, as reemphasized in *Kingsley*, weigh in favor of Plaintiff. Therefore, based on the evidence presented in the summary judgment record, a reasonable jury could find that Defendant's actions violated Plaintiff's constitutional rights.

### 2. Clearly Established Law

Having concluded that Defendant's use of a Taser violated the Constitution, the Court next determines whether it was clearly established, prior to May 17, 2014, that using a Taser to compel compliance from a pretrial detainee who is neither acting aggressively nor actively resisting efforts to restrain him constitutes a violation of the detainee's constitutional rights. After reviewing the state of the law in the Tenth Circuit, as well as the "weight of authority from other courts," *see Panagoulakos*, 741 F.3d at 1129, the Court concludes that it was.

### a. Tenth Circuit

Prior to May 17, 2014, the Tenth Circuit announced that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force – or a verbal command – could not exact compliance." *See Casey*, 509 F.3d at 1282, 1286 (finding excessive use

of force where plaintiff was subjected to "an arm-lock, a tackling, a Tasering, and a beating" during arrest where officers "suspected [plaintiff] of innocuously committing a misdemeanor" and plaintiff "was neither violent nor attempting to flee").[7]  In *Booker*, 745 F.3d 405, decided March 11, 2014, two months prior to the incident giving rise to Plaintiff's claims, the plaintiff asserted that defendants used excessive force in subduing Booker after he physically resisted going into a holding cell during booking.  Booker died after defendants put "substantial pressure on his back," Tasered him, and put him in a "carotid neckhold," even though Booker "did not resist during the vast majority of the encounter."  *Id.* at 414, 424.  In determining that defendants were not entitled to qualified immunity, the Tenth Circuit announced that "*Weigel* [*v. Broad*, 544 F.3d 1143 (10th Cir. 2008)] (pressure on back), *Casey* (taser), and the weight of authority from other jurisdictions (neck restraint) put Defendants on notice that use of such force on a person who is not resisting and who is restrained in handcuffs is disproportionate."[8]  *Id.* at 428-29 (citations and footnote omitted).

Here the law at the time of the incident put Defendant on notice that using a Taser to coerce compliance with a command from a detainee who was not acting aggressively and whom the officer had not attempted to restrain in any other manner was a violation of that detainee's constitutional

---

[7] In an unpublished opinion, entered six months before *Casey*, the Tenth Circuit found that the plaintiff did not show that prison officials' use of a Taser on him when he failed to comply with an order after previously being "involved in a physical altercation with deputies" was objectively unreasonable.  *Hunter v. Young*, 238 F. App'x 336, 337, 339 (10th Cir. 2007) (unpublished) (This and other unpublished opinions herein are not precedential but are cited for their persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.).  The Tenth Circuit noted that "[f]ederal courts have held that the use of a taser or similar stun gun is not per se unconstitutional when used to compel obedience by inmates" and that "[c]ourts should . . . be extremely cautious before attempting to prohibit or limit the necessary means prison officials use to carry out their responsibilities."  *Id.* at 339 (citation and internal quotation marks omitted).

[8] The Tenth Circuit took into account that Booker was restrained when he was Tasered.  This Court notes that, although Plaintiff was not in handcuffs because Defendant did not make any attempt to place him in restraints, Plaintiff signified surrender by showing his hands before Defendant stunned his with a Taser.

rights.  In *Casey*, the Tenth Circuit laid out the ground rules that a Taser is not to be employed where a lesser amount of force could be used to gain compliance.  In *Booker*, the Tenth Circuit applied the rule from *Casey* to a pretrial detainee.  Even though Booker had been actively resisting at various points during the encounter, once active resistance ceased and the officers had no reason to believe they could not control him because he was restrained, the use of a Taser constituted a violation of Booker's constitutional rights.  Even *Hunter*, the Tenth Circuit's unpublished opinion handed down prior to *Casey*, is consistent with the Tenth Circuit's admonition in *Casey*, as the inmate in *Hunter* had engaged in a physical confrontation with guards moments before taser deployment, giving them reason to believe that a lesser degree of force would not be sufficient.  Given the state of case law at the time of the incident, every reasonable officer would have known that it was a constitutional violation to Taser a non-aggressive pretrial detainee who failed to comply with an order but gave no indication that a lesser degree of force would not be sufficient to enforce compliance.

### b.    Other Circuits

Even if case law from the Tenth Circuit was not "clearly established" at the time of the incident, the "clearly established weight of authority from other courts," discussed below, was sufficient to put Defendant on notice that using a Taser to compel compliance from a pretrial detainee who is neither acting aggressively nor actively resisting efforts to restrain him constitutes a violation of the detainee's constitutional rights.

In 2009, the Seventh Circuit determined that, under certain circumstances, a Taser could not be used on a "pre-sentencing detainee" to compel compliance with a command.  *See Lewis v. Downey*, 581 F.3d 467 (7th Cir. 2009).  In *Lewis*, officers sought to enter plaintiff's cell to retrieve pills after jail officials believed plaintiff had threatened suicide.  *Id.* at 470-71.  According to the

17

plaintiff, officers ordered him to get off his bunk, but "[i]nstead of standing, [plaintiff] says that he turned his head toward the officers, and before he could explain his failure to comply and without further warning or provocation, [one of the defendants] shot him in the leg with a taser gun." *Id.* at 471.   In denying qualified immunity and concluding that a reasonable jury could find that the defendants had violated the plaintiff's constitutional rights, the Seventh Circuit noted that there had been cases "upholding the use of taser guns" where "the victims have been violent, aggressive, confrontational, unruly, or presented an immediate risk of danger to themselves or others." *Id.* at 477.   Even so, "no reasonable officer would think that he would be justified in shooting [plaintiff] with a taser gun" in "the absence of any agitation or threat," where there was only a short time between the order and deployment of the Taser; where there was only a "single, unrepeated order"; and there were no "warnings regarding the consequences of [plaintiff's] failure to comply." *Id.* at 478-79 (internal quotation marks omitted).

In 1993, the Eighth Circuit determined that, while "[t]here is no question that prison officials may compel compliance with legitimate prison regulations," federal law "does not authorize the day-to-day policing of prisons by stun gun." *See Hickey*, 12 F.3d at 759.   In *Hickey*, plaintiff refused an order to sweep his cell.   *Id.* at 756.   Even when other officers were called in to assist, plaintiff "remained steadfast in his refusal to sweep, using profanity and waving his hands as he spoke." *Id.* Finally, plaintiff was warned that a stun gun would be used if he did not comply, and  when plaintiff still would not comply, officers used the stun gun on plaintiff.   *Id.*   The Eighth Circuit stated that, under the facts of the case, it could "draw no other conclusion than that the stun gun was used on [plaintiff] to cause enough pain and harm to force him to sweep his cell, and to make an example

out of him" and it held that "a stun gun is not a constitutionally permissible option" for "ensur[ing] compliance with their internal housekeeping regulations." *Id.* at 758, 759 (footnote omitted).

In 2008, the Fourth Circuit concluded that the defendant's Tasering of an arrestee who was "yell[ing], curs[ing] and bang[ing] her head against the police car window" was done to "punish or intimidate" the plaintiff and was not objectively reasonable.[9] *See Orem*, 523 F.3d at 444, 449; *see also Sawyer v. Asbury*, 537 F. App'x 283 (4th Cir. 2013) (unpublished) (affirming the district court's grant of detainee's motion for judgment as a matter of law, after jury found for deputy, where deputy grabbed and choked plaintiff in response to plaintiff's defiant – but non-violent – actions and abusive language). In *Orem*, three officers placed plaintiff "in handcuffs, a foot restraint device ('hobbling device'), and put her in a police car." *Orem*, 523 F.3d at 444. During the trip, plaintiff "yelled, cursed and banged her head against the police car window . . . . Her jumping and banging around in the back seat was so intense that the vehicle rocked, loosening the hobbling device." *Id.* When the transporting officer pulled over to tighten the hobbling device, defendant – another police officer – "opened the rear door" of the transporting officer's vehicle and told plaintiff to "calm down." *Id.* When plaintiff did not calm down and cursed at defendant, he Tasered plaintiff twice and told her "[y]ou need to respect us." *Id.* at 444-45. The Fourth Circuit concluded that defendant's "use of the taser was unnecessary and excessive given that she was handcuffed and in

---

[9] Additionally, in 2003, the Fourth Circuit found that the "mere use of foul language, even a drunk's loud use of such language in a police station, does not justify an objectively reasonable police officer" using a high degree of physical force against a detainee. *See Jones v. Buchanan*, 325 F.3d 520, 530 (4th Cir. 2003). In *Jones*, after plaintiff – who was drunk and had been using 'pretty foul language' while seated in the processing room of the sheriff's department – began to stand up out of his seat, an officer "knock[ed] [him] to the floor, jump[ed] on him, and br[oke] his nose." *Id.* at 524, 528. In denying qualified immunity, the Fourth Circuit noted that a "drunken plaintiff's 'screaming' and use of 'foul language' in a confined area . . . constitutes a mere 'nuisance' and not an immediate threat to the safety of the officers or others." *Id.* at 530.

foot restraints," even though "it was clear that some action was necessary to calm [plaintiff] and safely transport her to" the jail.  *Id.* at 446.

In an unpublished opinion, filed in 2013, the Third Circuit affirmed the denial of summary judgment on an excessive use of force claim where officers used a Taser on a restrained prisoner in the face of continued passive resistance.  *See Everett v. Nort*, 547 F. App'x 117 (3d Cir. 2013) (unpublished).   After plaintiff refused to be fingerprinted so that he could have commissary privileges, officers placed plaintiff in a restraint chair.  *Id.* at 119.  While in the restraint chair, plaintiff clinched his hands so as to prevent officers from taking his fingerprints, and officers Tasered him until they were able to scan his fingerprints.  *Id.*  The Third Circuit reversed the district court's grant of summary judgment, noting that even though he was engaging in passive resistance, plaintiff was restrained and was not acting violently at the time he was Tasered.  *Id.* at 121-22.

In 1988, the Ninth Circuit concluded that the threatened use of a Taser did not violate the Constitution where "[t]he taser was used to enforce compliance with a search that had a reasonable security purpose, not as punishment."  *See Michenfelder v. Sumner*, 860 F.2d 328, 335 (9th Cir. 1988).  In *Michenfelder*, plaintiff was "threatened with a taser when he refused to submit to a strip search outside his cell" and other inmates were Tasered when they refused to comply with the strip searches.  *Id.* at 330, 334-35.  The Ninth Circuit commented that:

> [a] finding that the taser gun is not per se unconstitutional would not validate its unrestricted use. . . . A legitimate prison policy of carrying tasers to enforce discipline and security would not warrant their use when unnecessary or "for the sole purpose of punishment or the infliction of pain."  Overall, the evidence does not establish "unwarranted use of this painful and dangerous [device] as a matter of practice."

*Id.* at 336 (citations omitted).

Based upon case law from the Tenth Circuit as well as the weight of authority from other circuits, the Court finds that the law was clearly established at the time of the incident. Therefore, because there was a constitutional violation and the law was clearly established, Defendant is not entitled to qualified immunity.

### B.   Back Injury

Plaintiff also alleges that, after Defendant stunned him with a Taser, "[Defendant] demanded that I better pick the inhaler up. I informed him that my back was hurt and I had permanent knee damage, and that I couldn't pick it up. Especially while still cuffed behind the back. He grabbed me and forced me to pick it up anyway" (Doc. 1 at 7). Defendant asserts in his motion for summary judgment that DO Burns "assisted" Plaintiff in "squatt[ing] down to pick up his inhaler" (Doc. 23 at 2). In his response and affidavit (Docs. 25, 26), Plaintiff does not controvert Defendant's assertion that Defendant was not the officer who "grabbed" Plaintiff.

It appears that, in response to Defendant's motion for summary judgment, Plaintiff asserts two new theories of liability: supervisor liability and failure to intervene (*see* Doc. 25 at 3; Doc. 26 at 3). Plaintiff states that after Defendant Tasered him, Defendant "ordered that I still had to pick up the inhaler" (Doc. 25 at 2). He further asserts that, even though he "wasn't quite sure which officer pushed me downwards to pick up the inhaler," "[i]t was already clear that [Defendant] was the leading officer of the three. He was the only one calling shots or giving orders" (Doc. 26 at 3; Doc. 25 at 3). Plaintiff states that he "[does] know that it was [Defendant's] command" (Doc. 26 at 3).

Defendant is entitled to summary judgment on Plaintiff's claim that he forced Plaintiff to pick up the empty inhaler. Plaintiff asserts, and Defendant does not contest, that he was not the

officer who "grabbed" plaintiff and made him pick up the inhaler.  Additionally, to the extent that Plaintiff asserts new grounds for liability in his response to Defendant's motion for summary judgment, the Court will not address them, as Plaintiff has not sought to amend his complaint.[10]

Upon review of the summary judgment record, the Court finds that there is no genuine dispute of material fact, and Defendant is entitled to judgment as a matter of law on this claim.

## IV.    Failure to Provide Adequate Medical Care

In Count 2 of his complaint (Doc. 1), Plaintiff alleges (1) that when Defendant stunned him with a Taser, he fell and injured his back and did not receive treatment and (2) that Defendant prevented him from going to the medical unit to receive a breathing treatment.  Plaintiff also alleges that "knowing I was having an asthma attack, and knowing that my back was hurt, [Defendant] still denied me access to medical and insisted that one of the officers [] take me to a holding cell in booking as punishment."  Doc. 25 at 8.

A pretrial detainee's right to receive adequate medical care is protected by the Fourteenth Amendment and the standard for evaluating his claim under the Fourteenth Amendment is the same as the standard under the Eighth Amendment: a plaintiff must demonstrate "deliberate indifference to serious medical needs."  *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985).

---

[10] The Court notes that, if Plaintiff were to amend his complaint to include new claims of supervisor liability and failure to intervene based on the allegations in his complaint, response to Defendant's motion for summary judgment, and affidavit, Plaintiff would not state a claim for relief based on either supervisor liability or failure to intervene.  While Plaintiff alleges that Defendant "ordered that I still had to pick up the inhaler" (Doc. 25 at 2), Plaintiff does not allege that Defendant instructed the other officer to grab and force Plaintiff down or that Defendant was on notice that the other officer intended to do so.  Even though Plaintiff asserts that he "[does] know that it was [Defendant's] command," the only command Plaintiff records is that he "still had to pick up the inhaler" (Doc. 26 at 3; Doc. 25 at 2).  That allegation is not enough to show that Defendant instructed the other officer on how to accomplish that task or that Defendant knew how the other officer intended to accomplish the task.

"Deliberate indifference" is defined as knowing and disregarding an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 827 (1994). In *Wilson v. Seiter*, 501 U.S. 294 (1991), the Supreme Court explained that the deliberate indifference standard has two components: (1) an objective requirement that the pain or deprivation be sufficiently serious; and (2) a subjective requirement that the offending officials act with a sufficiently culpable state of mind. *Id.* at 298-99. Negligence does not state a claim under § 1983 for deliberate indifference to medical needs. *See Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997). "[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Oxendine v. Kaplan*, 241 F.3d 1272, 1277 n.7 (10th Cir. 2001) (internal citations and quotation marks omitted). A delay in medical care only constitutes a constitutional violation where the plaintiff can show that the delay resulted in substantial harm. *Id.* at 1276.

## A.    Back Injury

Plaintiff alleges that he injured his back when Defendant Tasered him and that he was not provided with medical treatment (Doc. 1). Even viewing the evidence presented in the light most favorable to Plaintiff, he has not shown that Defendant acted with deliberate indifference to a serious medical need. After handcuffing Plaintiff, Defendant ordered one of the other officers to take Plaintiff to the booking nurse, and Plaintiff informed the booking nurse that his back was hurt (Doc. 26 at 4). The booking nurse then sent Plaintiff to the main medical unit, and they instructed Plaintiff to "give it a couple weeks, and if it still was bothering me to put in a sick call" (*id.*). Plaintiff does not assert that Defendant interfered with the medical treatment for his back in any way. Therefore, upon review of the summary judgment record, the Court finds that there is no genuine dispute of material fact, and Defendant is entitled to judgment as a matter of law on this claim.

**B.** **Breathing Treatment**

Plaintiff also asserts that Defendant prevented him from receiving a needed breathing treatment by ordering him to return to his pod (Doc. 1).  Even viewing the evidence presented in the light most favorable to Plaintiff, he has not shown that Defendant acted with deliberate indifference to a serious medical need.  Specifically, Plaintiff has not shown that Defendant "knew [Plaintiff] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it."  *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (citation omitted).

The record reflects that Defendant did not deny Plaintiff access to the medical unit.  Instead, Defendant ordered Plaintiff to return to his maximum security pod and wait for an officer to escort him to the medical unit.  Even though Plaintiff alleges that he was having "respatory [sic] distress" and makes the general statement that he was "having an asthma attack, time was critical" (Doc. 26 at 1, 2), nothing in the record suggests that the situation was so dire that any delay in going to the medical unit resulted in a substantial risk of serious harm.  When Plaintiff informed the detention officer assigned to his pod that he needed to go to medical, the detention officer released him to go to medical *with* an escort (*see* Doc. 25 at 5 ("Detention Officer Bagby called for an escort and allowed me into the sally port.")).

Plaintiff also does not allege facts sufficient to show that Defendant knew he was at a substantial risk of harm at the time he told him to return to his pod and wait for an escort.  Plaintiff asserts that he was "wheezing and coughing" at the time (*id.* at 6), and Plaintiff asserts, and Defendant confirms, that Plaintiff informed the officers that he was going to the medical unit (Doc. 26 at 2; Doc. 23 at 4).  Even so, the uncontroverted evidence shows that Plaintiff was walking down the hall under his own power and had sufficient respiratory function to speak with officers (*see* Doc.

24

26 at 1-3).  Nothing in the record suggests that the detention officer assigned to Plaintiff's pod or the medical unit communicated with Defendant before the incident.  Additionally, Plaintiff did receive treatment when, after Plaintiff was handcuffed, Defendant ordered one of the other officers to take Plaintiff to the booking nurse (Doc. 25 at 7), and Plaintiff states that he informed the booking nurse that he needed a breathing treatment (*id.* at 8).  Therefore, upon review of the summary judgment record, the Court finds that there is no genuine dispute of material fact, and Defendant is entitled to judgment as a matter of law on this claim.

## *CONCLUSION*

Defendant is not entitled to either judgment as a matter of law or qualified immunity on Plaintiff's claim that Defendant's use of a Taser constituted an excessive use of force.  Defendant is entitled to summary judgment on Plaintiff's claim that Defendant used excessive force by making him pick up his inhaler after his back was injured, and Defendant is entitled to summary judgment on Plaintiff's claims that Defendant failed to provide adequate medical care.

**ACCORDINGLY IT IS HEREBY ORDERED** that: Defendant's motion for summary judgment (Doc. 23) is **granted in part** and **denied in part** as follows:

1.    Defendant's motion is **denied** as to Plaintiff's claim that Defendant's use of a Taser constituted an excessive use of force, and

2.    Defendant's motion is **granted** as to Plaintiff's claims that Defendant used excessive force by making him pick up his inhaler after his back was injured, and that Defendant failed to provide adequate medical care.

ORDERED THIS 30th day of August, 2016.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE